1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9

10

11  NATHAN L. HUNTER, aka NATHAN        )    No. CV 07-2236-RC
    LAVELL HUNTER,                      )
12                                      )
               Plaintiff,               )
13                                      )    OPINION AND ORDER
          v.                            )
14                                      )
    MICHAEL J. ASTRUE,                  )
15  Commissioner of Social Security,    )
                                        )
16             Defendant.               )
    _____)

17

18       Plaintiff Nathan L. Hunter, aka Nathan Lavell Hunter, filed a

19  complaint on April 10, 2007, seeking review of the Commissioner's

20  decision denying his application for disability benefits.  The

21  Commissioner answered the complaint on August 31, 2007, and the

22  parties filed a joint stipulation on October 9, 2007.

23

24                            **BACKGROUND**

25                                I

26       On July 25, 2005, plaintiff applied for disability benefits under

27  Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, claiming

28  an inability to work since January 1, 2001, due to mental problems.

1  Certified Administrative Record ("A.R.") 46-53.  The plaintiff's
2  application was denied initially on December 5, 2005.  A.R. 22-27.
3  The plaintiff then requested an administrative hearing, which was held
4  before Administrative Law Judge Zane A. Lang ("the ALJ") on March 8,
5  2006.  A.R. 28-29, 287-321.  On June 30, 2006, the ALJ issued a
6  decision finding plaintiff is not disabled.  A.R. 10-20.  The
7  plaintiff appealed this decision to the Appeals Council, which denied
8  review on February 16, 2007.  A.R. 4-7, 283-84.

9

10                                   II

11       The plaintiff, who was born on July 28, 1963, is currently 44
12  years old.  A.R. 46.  He has a tenth-grade education, and has
13  previously worked as a machinist and tool maker.  A.R. 54, 56-57, 85-
14  92.

15

16       The plaintiff was imprisoned for child molestation and, while in
17  prison, received mental health treatment.  A.R. 100-63, 205-08, 212-
18  52.  On or about May 31, 2000, Cristine Cardin, Psy.D., a prison
19  psychologist, examined plaintiff, conducted psychological testing, and
20  diagnosed plaintiff with: schizoaffective disorder, depressive type;
21  pedophilia, sexually attracted to females, limited to incest,
22  exclusive type; and an unspecified personality disorder with
23  borderline, antisocial and narcissistic features; and determined
24  plaintiff's Global Assessment of Functioning ("GAF") was 45.[1]  A.R.

25

26       [1]  A GAF of 41-50 means that the individual exhibits
    "[s]erious symptoms (e.g., suicidal ideation, severe obsessional
27  rituals, frequent shoplifting) or any serious impairment in
    social, occupational, or school functioning (e.g. no friends,
28  unable to keep a job)."  American Psychiatric Ass'n, Diagnostic

                                    2

114-19.[2]  On February 22, 2001, Tim Ross, MSW, a psychiatric social worker, opined plaintiff "should be psychiatrically unassigned . . . through 8-31-01 due to gross perceptual disturbances and severe paranoia while his condition is being stabilized by medications." A.R. 113.  On July 24, 2001, a prison interdisciplinary treatment team found plaintiff was totally disabled due to gross perceptual disturbances resulting in plaintiff's inability to understand, remember, and carry out simple instructions or to maintain basic attention for at least 30 minutes, as well as by severe paranoia that causes an inability to relate and interact appropriately with supervisors.  A.R. 112.

On October 25, 2001, plaintiff was sent to Atascadero State Hospital ("ASH") for treatment.  A.R. 207.  On July 23, 2002, John Cannell, M.D., a staff psychiatrist at ASH, diagnosed plaintiff as having an unspecified personality disorder with antisocial and obsessive-compulsive features, found plaintiff's GAF was 60,[3] recommended plaintiff be returned to prison under California Penal

---

and Statistical Manual of Mental Disorders, 34 (4th ed. (Text Revision) 2000).

[2]  This report is incomplete, undated, and poorly photocopied, making it difficult to review.

[3]  A GAF of 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. (Text Revision) 2000).

3

1  Code ("P.C.") § 2685,[4] and opined plaintiff will need continued

2  psychiatric followup for his paranoid schizophrenia.  A.R. 109.  On

3  August 29, 2002, Edward Cavanagh, M.D., another ASH staff

4  psychiatrist, examined plaintiff and also recommended plaintiff be

5  returned to prison under P.C. § 2685 since plaintiff "has shown

6  nothing but stability and no evidence of severe symptoms of an Axis I

7  disorder" during the previous month.  A.R. 111.

8

9       On or about September 11, 2002, plaintiff was returned to prison

10  because he "ha[d] been treated to such an extent that he [would] not

11  benefit from further care and treatment in a state facility[,]" A.R.

12  110, and he was initially placed in an intensive outpatient

13  care/locked observation unit.  A.R. 207.  On September 18, 2002,

14  Shirley Stack, Ph.D., a clinical psychologist, examined plaintiff,

15  concluded he was quite stable, and discharged him from the unit.  A.R.

16  207-08.

17

18       On November 4, 2003, J. Roorda, a licensed clinical social

19  worker, opined plaintiff was malingering.  A.R. 150.  On January 7,

20

21  _____

22       [4]  P.C. § 2685 provides, in pertinent part:

23       When in the opinion of the superintendent the mentally
         ill, mentally deficient or insane prisoner has been
24       treated to such an extent that such person will not
         benefit by further care and treatment in the state
25       hospital, the superintendent shall immediately notify
         the Director of Corrections of that fact.  The Director
26       of Corrections shall immediately send for, take and
         receive the prisoner back into prison.
27

28  P.C. § 2685.

4

2004, Janet N. Sotomayor, Ph.D., a staff psychologist, examined plaintiff, found he was stable without medication, and determined plaintiff's GAF was 70.[5] A.R. 149.  On February 4, 2004, J. Roorda opined there was still no evidence of an Axis I diagnosis for plaintiff.  A.R. 147.  On February 11, 2004, plaintiff was found to be noncompliant with his medication, but also found to be alert and oriented, cooperative, and with clear speech and no somatic complaints.  A.R. 146.  On April 7, 2004, O. Taylor, M.D., a staff psychiatrist, examined plaintiff, found plaintiff's mental status was good, and opined it was unusual for a schizophrenic to maintain stability without psychotropic medication.  A.R. 142.  On April 7, 2004, Madeline M. Daniels, Ph.D., a licensed psychologist, examined plaintiff, opined plaintiff had an inconsistent presentation of symptoms and did not appear schizophrenic or psychotic, and diagnosed plaintiff as "rule out" malingering.  A.R. 238.  On April 27, 2004, after plaintiff reported feeling paranoid, Dr. Sotomayor examined plaintiff and opined plaintiff did not pose any danger to himself or others.  A.R. 133, 140.

Plaintiff was placed in administrative segregation from April 26 to May 4, 2004, and while there, it was determined he was stable and oriented, showed no signs or symptoms of decompensation, and had no

_____

    [5]  A GAF of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. (Text Revision) 2000).

1   somatic complaints.  A.R. 134, 136.  On May 4, 2004, a staff
2   psychologist opined plaintiff "appears to be malingering."  A.R. 233.
3   On June 9, 2004, Dr. Sotomayor found plaintiff was not compliant with
4   his medication, observed he appeared stable without psychotropic
5   medication, and determined plaintiff's GAF was 66.  A.R. 130.  On
6   August 10, 2004, Dr. Sotomayor again determined plaintiff was stable
7   without medication and his GAF was 65.  A.R. 129.  On November 10,
8   2004, Dr. Sotomayor met with plaintiff at plaintiff's request, and
9   plaintiff complained that his correctional counselor was planning to
10  house him in the gym, where he did not want to be housed; but Dr.
11  Sotomayor stated there was no mental health reason why plaintiff could
12  not be transferred to the gym.  A.R. 127.

13

14       On April 27, 2005, Dr. Sotomayor continued to report that
15  plaintiff appeared stable without psychotropic medication, and
16  determined plaintiff's GAF was 68.  A.R. 123.  Furthermore, Dr.
17  Sotomayor noted plaintiff, who was shortly to be released from prison,
18  talked about how he would not be able to succeed in society because of
19  his history and inquired about the criteria for disability benefits
20  and whether he qualified for such benefits.  Id.  Dr. Sotomayor
21  concluded caution should be used when evaluating plaintiff for
22  disability benefits.  Id.

23

24       On October 7, 2005, Jobst Singer, M.D., a non-prison
25  psychiatrist, examined plaintiff, diagnosed him with an unspecified
26  psychosis and determined plaintiff's GAF was 50.  A.R. 164-67.  Dr.
27  Singer concluded:
28  //

6

1  [Plaintiff's] ability to understand, remember and perform

2  instructions is mildly impaired for simple tasks and

3  moderately impaired for complex tasks.  Although persistence

4  cannot be fully evaluated in an evaluation of this type, the

5  [plaintiff's] mental slowness could significantly interfere

6  somewhat with the [plaintiff's] ability to complete a normal

7  day of work.  The [plaintiff's] judgment showed no

8  significant impairment during the interview that would

9  increase safety risks above normal in the usual work

10  setting.  [¶]  Based on behavior during the interview, the

11  [plaintiff's] ability to relate and interact with coworkers

12  and the public, as well as the ability to be supervised, is

13  not impaired.  [¶]  **It is not clear to the interviewer if**

14  **the [plaintiff's] presentation is real or simulated.**

15

16  A.R. 166-67 (emphasis added).

17

18       On December 5, 2005, C.H. Dudley, M.D., a nonexamining

19  psychiatrist, diagnosed plaintiff as having a severe mental impairment

20  that causes a "mild" restriction in his activities of daily living and

21  "moderate" difficulty maintaining social functioning and

22  concentration, persistence or pace; however, there was "insufficient

23  evidence" to demonstrate whether plaintiff has ever experienced any

24  episodes of decompensation.  A.R. 178-89.  Dr. Dudley further opined

25  plaintiff is moderately limited in his ability to: understand,

26  remember and carry out detailed instructions; maintain attention and

27  concentration for extended periods; perform activities within a

28  schedule, maintain regular attendance, and be punctual within

7

customary tolerances; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting, but he was otherwise not significantly limited.  A.R. 174-76.  Dr. Dudley concluded plaintiff is capable of performing simple repetitive tasks in a low stress public contact environment.  A.R. 176.

On February 16, 2006, Gary Chase, M.D., a psychiatrist, who had been treating plaintiff since January 31, 2005, diagnosed plaintiff as having paranoid schizophrenia and opined plaintiff is not competent, is dependent on others, and requires residential care.  A.R. 256-59. Dr. Chase reported plaintiff is actively psychotic at times, is guarded, paranoid, and socially reclusive, experiences depression, irritability, anxiety, and mood swings, among other symptoms, has had multiple head injuries, appears cognitively impaired, and has problems with short- and long-term memory, impulsivity, and poor judgment. A.R. 257-58.  Dr. Chase further opined plaintiff's ability to concentrate and complete tasks is severely impaired and he has a poor ability to adapt to work or work-like situations.  A.R. 258. Furthermore, Dr. Chase opined plaintiff has a "severe"[6] impairment in his ability to: maintain attention for two-hour segments; maintain regular attendance and be punctual; sustain an ordinary routine

---

[6]  "Severe" means "[n]o useful ability to function in this area."  A.R. 255.

without special supervision; work in coordination with or in close
proximity to others without being distracted by them; make simple
work-related decisions; complete a normal work day without
interruptions from psychologically-based symptoms, performing at a
consistent pace without an unreasonable number of and length of rest
periods; accept instructions and respond appropriately to criticism
from supervisors; get along with co-workers or peers without
distracting them or exhibiting behavioral extremes; respond
appropriately to changes in a work setting; and be aware of normal
hazards and take appropriate precautions.  A.R. 253-55.  Dr. Chase
also determined plaintiff has "marked"[7] limitations in his ability to
remember work-like procedures, understand, remember and carry out
short and simple instructions, and ask simple questions and request
assistance.  A.R. 253-54.

On April 18, 2006, Ahmad R. Riahinejad, Ph.D., a licensed
clinical psychologist, examined plaintiff and diagnosed him as
malingering on examination and as having a schizoaffective disorder
and pedophilia per prison history, an antisocial personality disorder,
and rule out moderate mental retardation.  A.R. 271-81.  Dr.
Riahinejad described plaintiff's appearance at the examination as
follows:

> The [plaintiff] appeared poorly groomed. . . .  When he came
> into the examination room, he was trying to search behind
> the door and underneath the desk.  He said that he was

---

[7]   "Marked" means "[a]bility to function is seriously
limited but not severe."  A.R. 255.

1   accompanied by an imaginary friend named, "Eddie." He was

2   talking to "Eddie" during the evaluation, laughing and

3   crying, and at one point, he jumped off the chair and dove

4   onto the floor, as he was getting [into] a fight with

5   "Eddie."

6

7   A.R. 272.  Dr. Riahinejad further noted plaintiff "was generally very

8   suspicious.  He was constantly talking to his imaginary friend.  He

9   was minimally cooperative. . . .  **It appeared that he was trying to**

10  **simulate mental illness.**  His overall attitude was characterized by

11  what appeared to be insufficient effort."  A.R. 273-74 (emphasis

12  added).  Dr. Riahinejad concluded he could not comment on plaintiff's

13  work-related abilities because plaintiff put forth no effort on

14  psychological testing and plaintiff's GAF was "unclear," while

15  plaintiff's actions during the examination were felt to be a

16  simulation.  A.R. 276, 279-81.  On the other hand, Dr. Riahinejad

17  stated that "as he presented himself today, he is unable to manage

18  funds on his own behalf.  He was not able to understand, remember or

19  carry out even the simplest instructions."  A.R. 276.

20

21                               **DISCUSSION**

22                                  **III**

23      The Court, pursuant to 42 U.S.C. § 405(g), has the authority to

24  review the Commissioner's decision denying plaintiff disability

25  benefits to determine if his findings are supported by substantial

26  evidence and whether the Commissioner used the proper legal standards

27  in reaching his decision.  <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035

28  (9th Cir. 2007); <u>Hoopai v. Astrue</u>, 499 F.3d 1071, 1074 (9th Cir. 2007).

1    "In determining whether the Commissioner's findings are supported
2    by substantial evidence, [this Court] must review the administrative
3    record as a whole, weighing both the evidence that supports and the
4    evidence that detracts from the Commissioner's conclusion." Reddick
5    v. Chater, 157 F.3d 715, 720 (9th Cir. 1998); Holohan v. Massanari,
6    246 F.3d 1195, 1201 (9th Cir. 2001).  "Where the evidence can
7    reasonably support either affirming or reversing the decision, [this
8    Court] may not substitute [its] judgment for that of the
9    Commissioner." Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007),
10   cert. denied, 128 S. Ct. 1068 (2008); Lingenfelter, 504 F.3d at 1035.
11
12       The claimant is "disabled" for the purpose of receiving benefits
13   under the Act if he is unable to engage in any substantial gainful
14   activity due to an impairment which has lasted, or is expected to
15   last, for a continuous period of at least twelve months.  42 U.S.C. §
16   423(d)(1)(A); 20 C.F.R. § 404.1505(a).  "The claimant bears the burden
17   of establishing a prima facie case of disability." Roberts v.
18   Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122
19   (1996); Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir. 1996).
20
21       The Commissioner has promulgated regulations establishing a five-
22   step sequential evaluation process for the ALJ to follow in a
23   disability case.  20 C.F.R. § 404.1520.  In the **First Step**, the ALJ
24   must determine whether the claimant is currently engaged in
25   substantial gainful activity.  20 C.F.R. § 404.1520(b).  If not, in
26   the **Second Step**, the ALJ must determine whether the claimant has a
27   severe impairment or combination of impairments significantly limiting
28   him from performing basic work activities.  20 C.F.R. § 404.1520(c).

11

1  If so, in the **Third Step**, the ALJ must determine whether the claimant

2  has an impairment or combination of impairments that meets or equals

3  the requirements of the Listing of Impairments ("Listing"), 20 C.F.R.

4  § 404, Subpart P, App. 1.  20 C.F.R. § 404.1520(d).  If not, in the

5  **Fourth Step**, the ALJ must determine whether the claimant has

6  sufficient residual functional capacity despite the impairment or

7  various limitations to perform his past work.  20 C.F.R. §

8  404.1520(f).  If not, in **Step Five**, the burden shifts to the

9  Commissioner to show the claimant can perform other work that exists

10  in significant numbers in the national economy.  20 C.F.R. §

11  404.1520(g).

12

13      Moreover, where there is evidence of a mental impairment that may

14  prevent a claimant from working, the Commissioner has supplemented the

15  five-step sequential evaluation process with additional regulations

16  addressing mental impairments.  <u>Maier v. Comm'r of the Soc. Sec.</u>

17  <u>Admin.</u>, 154 F.3d 913, 914 (9th Cir. 1998) (per curiam).  First, the

18  ALJ must determine the presence or absence of certain medical findings

19  relevant to the ability to work.  20 C.F.R. § 404.1520a(b)(1).

20  Second, when the claimant establishes these medical findings, the ALJ

21  must rate the degree of functional loss resulting from the impairment

22  by considering four areas of function: (a) activities of daily living;

23  (b) social functioning; (c) concentration, persistence, or pace; and

24  (d) episodes of decompensation.  20 C.F.R. § 404.1520a(c)(2-4).

25  Third, after rating the degree of loss, the ALJ must determine whether

26  the claimant has a severe mental impairment.  20 C.F.R. §

27  404.1520a(d).  Fourth, when a mental impairment is found to be severe,

28  the ALJ must determine if it meets or equals a Listing.  20 C.F.R. §

1   404.1520a(d)(2).  Finally, if a Listing is not met, the ALJ must then

2   perform a residual functional capacity assessment, and the ALJ's

3   decision "must incorporate the pertinent findings and conclusions"

4   regarding plaintiff's mental impairment, including "a specific finding

5   as to the degree of limitation in each of the functional areas

6   described in [§ 404.1520a(c)(3)]."  20 C.F.R. § 404.1520a(d)(3),

7   (e)(2).

8

9       Applying the five-step sequential evaluation process, the ALJ

10  found plaintiff has not engaged in substantial gainful activity since

11  his alleged onset date.  (Step One).  The ALJ then found plaintiff's

12  mild degenerative disc disease is a "severe" impairment, but plaintiff

13  does not have a severe mental impairment (Step Two), and he does not

14  have an impairment or combination of impairments that meets or equals

15  a Listing.  (Step Three).  The ALJ next determined plaintiff is able

16  to perform his past relevant work as a machine operator II; therefore,

17  he is not disabled.  (Step Four).

18

19                              **IV**

20      The Step Two inquiry is "a de minimis screening device to dispose

21  of groundless claims."  Smolen, 80 F.3d at 1290; Webb v. Barnhart, 433

22  F.3d 683, 687 (9th Cir. 2005).  The Supreme Court has recognized that

23  including a severity requirement at Step Two of the sequential

24  evaluation process "increases the efficiency and reliability of the

25  evaluation process by identifying at an early stage those claimants

26  whose medical impairments are so slight that it is unlikely they would

27  be found to be disabled even if their age, education, and experience

28  were taken into account."  Bowen v. Yuckert, 482 U.S. 137, 153,

1  107 S. Ct. 2287, 2297, 96 L. Ed. 2d 119 (1987).  However, an overly

2  stringent application of the severity requirement violates the Act by

3  denying benefits to claimants who meet the statutory definition of

4  disabled.  Corrao v. Shalala, 20 F.3d 943, 949 (9th Cir. 1994).

5

6       A severe impairment or combination of impairments within the

7  meaning of Step Two exists when there is more than a minimal effect on

8  an individual's ability to do basic work activities.  Webb, 433 F.3d

9  at 686; Mayes v. Massanari, 276 F.3d 453, 460 (9th Cir. 2001); see

10 also 20 C.F.R. § 404.1521(a) ("An impairment or combination of

11 impairments is not severe if it does not significantly limit [a

12 person's] physical or mental ability to do basic work activities.").

13 Basic work activities are "the abilities and aptitudes necessary to do

14 most jobs," including physical functions such as walking, standing,

15 sitting, lifting, pushing, pulling, reaching, carrying or handling, as

16 well as the capacity for seeing, hearing and speaking, understanding,

17 carrying out, and remembering simple instructions, use of judgment,

18 responding appropriately to supervision, co-workers and usual work

19 situations, and dealing with changes in a routine work setting.  20

20 C.F.R. § 404.1521(b); Webb, 433 F.3d at 686.  If the claimant meets

21 his burden of demonstrating he suffers from an impairment affecting

22 his ability to perform basic work activities, "the ALJ must find that

23 the impairment is 'severe' and move to the next step in the SSA's

24 five-step process."  Edlund v. Massanari, 253 F.3d 1152, 1160 (9th

25 Cir. 2001) (emphasis in original); Webb, 433 F.3d at 686.

26

27      Here, the ALJ extensively reviewed the medical records and

28 concluded plaintiff "does not have a 'severe' medically determinable

mental impairment." A.R. 15-17.  To the contrary, the ALJ found
plaintiff "is clearly a malingerer" and there is no evidence
"establish[ing] a medically determinable impairment when the
[plaintiff's] subjective allegations and easily feigned behavior is
not considered." Id.  The ALJ further determined that "[e]ven
assuming that the record does establish a medically determinable
mental impairment or combination of impairments, the record does not –
in the absence of the [plaintiff's] feigned behavior – establish any
mental limitations flowing from such impairment." A.R. 17.

     "[A]n ALJ may find that a claimant lacks a medically severe
impairment or combination of impairments only when his conclusion is
'clearly established by medical evidence.'" Webb, 433 F.3d at 687
(citation omitted).  Here, substantial evidence in the record supports
the ALJ's conclusion that plaintiff is a malingerer.  Initially, the
ALJ found plaintiff "malingered in a very crude and obvious fashion
during the consultative psychological examination" with Dr.
Riahinejad.  A.R. 15.  Indeed, plaintiff pretended he was accompanied
to the examination by an imaginary friend, "Eddie," who plaintiff
began to search for from the moment he entered the examining room.[8]
A.R. 272.  Then, having found "Eddie," plaintiff began a constant
conversation with his imaginary friend, which culminated with
plaintiff jumping off his chair and diving onto the floor, as if he
was fighting with "Eddie." A.R. 272-74.  Furthermore, during one of

_____

     [8]  Apart from Dr. Riahinejad's examination of plaintiff,
there is not any mention of an imaginary friend named "Eddie"
anywhere in plaintiff's medical records, and plaintiff apparently
created "Eddie" as part of his ploy to obtain disability
benefits.

the psychological tests he was supposed to be taking, plaintiff
stopped the test and instead offered his pencil to "Eddie," stating
"Eddie" wanted to do the rest of the examination, A.R. 274; plaintiff
did not respond to any questions on the Minnesota Multiphasic
Personality Inventory; and plaintiff's results on the Wechsler Adult
Intelligence Scale - 3rd edition demonstrated moderate mental
retardation, even though there is no other evidence of mental
retardation in plaintiff's medical records.  A.R. 275.  Based on these
and other findings, Dr. Riahinejad opined plaintiff was malingering
during the consultative examination, and the test results were
invalid.  A.R. 275-76.  Dr. Riahinejad's opinion supports the ALJ's
determination that plaintiff is a malingerer.  Orn v. Astrue, 495 F.3d
625, 632 (9th Cir. 2007); Tonapetyan v. Halter, 242 F.3d 1144, 1149
(9th Cir. 2001).

Moreover, plaintiff's prison records also support the ALJ's
determination that plaintiff is a malingerer.  That is, although
plaintiff was initially thought to be severely mentally ill while
incarcerated, it soon became apparent to the treatment staff that
plaintiff was manipulating his "illness," which waxed and waned
depending on plaintiff's particular needs.  Thus, while plaintiff was
extensively observed and found to be "quite stable" on medication at
ASH, A.R. 111, following his return from ASH, A.R. 207, and when he
stopped taking psychotropic medication all together, see, e.g., A.R.
123, 129-30, 141-42, 146-47, 149, 238, he nevertheless attempted to
use his "illness" to avoid prison grooming standards, see A.R. 150
(finding plaintiff malingering to avoid compliance with grooming
standards), and to attempt to manipulate his housing situation to his

16

satisfaction.  <u>See</u> A.R. 127, 133-34, 136, 140.  Further, several prison staff found plaintiff is a malingerer.  <u>See</u>, e.g., A.R. 123 (staff psychologist recommended caution in evaluating plaintiff for disability benefits), 133 (staff psychologist opined secondary gain should be considered regarding plaintiff's renewed psychiatric complaints following his placement in an unfavorable housing situation), 138 (staff psychiatrist diagnosed plaintiff with history of malingering), 142 (staff psychiatrist opined it was unusual for schizophrenic to maintain stability without psychotropic medication), 150 (licensed clinical social worker opined plaintiff was malingering to avoid compliance with grooming standards), 233 (staff psychologist opined plaintiff "appears to be malingering"), 238 (staff psychologist diagnosed plaintiff as "rule out malingering," finding plaintiff had an inconsistent presentation of symptoms and did not appear schizophrenic or psychotic).

The plaintiff, although not seriously challenging the ALJ's finding that he is a malingerer, contends the ALJ's Step Two determination is not supported by substantial evidence because the ALJ improperly rejected the opinions of Drs. Cardin, Chase, Singer and Dudley.  There is no merit to this claim.

Since the treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual[,]" <u>Sprague v. Bowen</u>, 812 F.2d 1226, 1230 (9th Cir. 1987); <u>Morgan v. Comm'r of the Soc. Sec. Admin.</u>, 169 F.3d 595, 600 (9th Cir. 1999), the ALJ must provide clear and convincing reasons for rejecting the uncontroverted opinion of a treating or examining physician, and

1    "[e]ven if [a] treating [or examining] doctor's opinion is

2    contradicted by another doctor, the ALJ may not reject this opinion

3    without providing 'specific and legitimate reasons' supported by

4    substantial evidence in the record." Reddick, 157 F.3d at 725;

5    Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006). The ALJ may

6    only "reject the opinion of a nonexamining physician by reference to

7    specific evidence in the medical record." Sousa v. Callahan, 143 F.3d

8    1240, 1244 (9th Cir. 1998). While "not bound by findings made by

9    State agency or other program physicians and psychologists, [the ALJ]

10   may not ignore these opinions and must explain the weight given to the

11   opinions in their decisions." S.S.R. 96-6p, 1996 WL 374180, *2

12   (S.S.A.); 20 C.F.R. § 404.1527(f).

13

14        Here, the ALJ fully explained the nature of plaintiff's

15   manipulations and malingering, stating:

16

17        [N]one of the diagnoses of mental illness found in the

18        record are based on signs or symptoms not reproducible by a

19        clever malingerer.  Indeed, the [plaintiff] appears to be

20        skilled at "working the system: . . . the [plaintiff]

21        attempted to feign mental illness in order to be assigned to

22        a psychiatric unit.  [Prison] records indicate that the

23        alleged symptoms appeared to wax and wane depending on

24        whether or not he wanted to be in a psychiatric unit.  For

25        instance, at one point while in a psychiatric unit, the

26        [plaintiff] asked for specific criteria for discharge.

27        Thereafter the [plaintiff] exhibited increased coping skills

28        and a remission from hallucinations.  Given the

18

1  [plaintiff's] history of feigning, the undersigned concludes

2  that the [plaintiff's] episode of "mental illness" and

3  subsequent remarkable "recovery" were mere manipulations.

4

5  A.R. 16 (citations omitted).  The ALJ then rejected the medical

6  opinions of Dr. Chase, plaintiff's treating physician, as well as Drs.

7  Singer and Dudley, primarily because their opinions were based "almost

8  exclusively" on the plaintiff's claims and observations of easily

9  feigned signs and symptoms of psychotic behavior.  A.R. 17; see also

10  id. (Dr. Singer's "diagnosis and limitations were based on the

11  [plaintiff's] allegations and history: the mental status examination

12  was completely benign with no sign of hallucinations or delusions.").[9]

13  Although noting Dr. Cardin based her diagnosis in part on psychometric

14  testing, the ALJ rejected Dr. Cardin's opinion because plaintiff "has

15  feigned on psychometric testing during other examinations."  Id.

16  Finally, the ALJ gave Dr. Dudley's opinion no weight because Dr.

17  Dudley found plaintiff to be at least partially credible, A.R. 190,

18  while the ALJ determined plaintiff was "generally incredible."  A.R.

19  17.  Since plaintiff does not challenge the ALJ's adverse credibility

20  determination, the ALJ provided proper bases for rejecting the

21  opinions of Drs. Cardin, Chase, Singer and Dudley.  Bayliss v.

22  Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005); see also Tonapetyan,

23  242 F.3d at 1149 ("Because the present record supports the ALJ in

24  discounting [plaintiff's] credibility. . . , he was free to disregard

25  [the examining physician's] opinion, which was premised on her

26  subjective complaints" and "on testing within [plaintiff's]

27  _____

28  [9]  Moreover, Dr. Singer was not sure whether plaintiff's
presentation was real or he was malingering.  A.R. 167.

1  control."); <u>Morgan</u>, 169 F.3d at 602 ("A physician's opinion of

2  disability 'premised to a large extent upon the claimant's own

3  accounts of his symptoms and limitations' may be disregarded where

4  those complaints have been 'properly discounted.'" (citations

5  omitted)); <u>Hubbard v. Barnhart</u>, 225 Fed. Appx. 721, 723 (9th Cir.

6  2007) (Unpublished Disposition) ("[Plaintiff's] malingering and lack

7  of credibility is a considerable taint that affects most of the

8  evidence she marshals.   [Plaintiff's] treating physicians all relied

9  on her subjective complaints about pain, discomfort and lack of energy

10  when making their diagnoses.   The ALJ properly discounted the treating

11  physicians' opinions after considering the [evidence of and] opinions

12  about [plaintiff's] malingering.").[10]

13

14      On the other hand, the record contains substantial evidence,

15  including the opinions of treating psychologist Dr. Sotomayor,

16  supporting the ALJ's conclusion that plaintiff does not have a severe

17  mental impairment.[11]  <u>Ukolov v. Barnhart</u>, 420 F.3d 1002, 1006 (9th

18  Cir. 2005); <u>Tidwell v. Apfel</u>, 161 F.3d 599, 601 (9th Cir. 1998); <u>see</u>

19  <u>also</u> <u>Raboubi v. Barnhart</u>, 2003 WL 22458903, *5-6 (N.D. Cal.) (ALJ

20  properly found claimant did not have severe mental impairment when

21  claimant "behaved uncooperatively and deceptively during diagnostic

22  _____

23      [10]   <u>See</u> Fed. R. App. P. 32.1(a); Ninth Circuit Rule 36-3(b).

24      [11]   To the extent plaintiff argues his malingering was
25  caused by a personality disorder and, thus, is a severe
    impairment in and of itself, <u>see</u> Jt. Stip. at 9:4-15, his claim
26  is without merit since plaintiff points to absolutely no evidence
    in the record demonstrating his malingering was caused by a
27  personality disorder.  <u>Matthews v. Shalala</u>, 10 F.3d 678, 680 (9th
    Cir. 1993); <u>Verduzco v. Apfel</u>, 188 F.3d 1087, 1089 (9th Cir.
28  1999).

tests" and her "mental condition was suggestive of malingering, rather than a valid mental disability"); <u>Rosenbaum v. Astrue</u>, 2008 WL 80149, *2 (E.D. Tenn.) (ALJ did not err in determining nonseverity of claimant's mental impairments in light of claimant's gross "malingering and the simple paucity of objective medical evidence in the record showing that [claimant] suffers from the severity of mental impairments which he claims. . .").  Thus, the ALJ did not err in making his Step Two determination that plaintiff does not have a severe mental impairment.


**ORDER**

     IT IS ORDERED that: (1) plaintiff's request for relief is denied; and (2) the Commissioner's decision is affirmed, and Judgment shall be entered in favor of defendant.


DATE: July 16, 2008

ROSALYN M. CHAPMAN
UNITED STATES MAGISTRATE JUDGE


R&R-MDO\07-2236.mdo
7/15/08